IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRITTANY SATTERFIELD, | ) |
|     Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 15 C 10308 |
| CHIPOTLE MEXICAN GRILL, INC., | ) ) ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Brittany Satterfield filed this lawsuit against Chipotle Mexican Grill, Inc. (Chipotle), alleging that Chipotle retaliated and discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 (PDA). 42 U.S.C. § 2000e(k). Chipotle has moved for summary judgment.

## Background

The Court takes the following facts from the parties' briefs and exhibits filed in connection with the motion for summary judgment. When facts are in dispute, the Court takes those facts in the light most favorable to Satterfield, the non-moving party.

Satterfield worked for Chipotle's Oak Brook East restaurant from September 2013 until she was terminated on October 7, 2014. Def.'s Statement of Material Facts (SOMF), Ex. 1 (Satterfield Dep.) at 57:11, 253:15-18. Satterfield was one of the Oak Brook East restaurant's first hires. Def.'s SOMF, Ex. 9 (Jaimes Dep.) at 34:20-35:6. While working for Chipotle, Satterfield reported to Alexis Infante, the restaurant's general manager. Infante, in turn, reported to Viviana Rendon, the restaurateur who

was responsible for the restaurant's field operations. Def.'s SOMF, Ex. 24 (Jaimes Decl.) ¶ 15. Infante also reported to Lorena Jaimes who, as team leader, was tasked with overseeing the operations of several Chipotle restaurants in the region including the Oak Brook East restaurant. *Id.* ¶¶ 5, 16.

Chipotle's Oak Brook East restaurant operated in the same fashion as other Chipotle restaurants. The restaurant is operated by a team of crew members who are responsible for preparing and cooking ingredients, assembling customer food orders, and performing similar tasks. *Id.* ¶ 7. The crew members are assisted by four levels of management (listed in ascending order of responsibility): kitchen manager, service manager, apprentice manager, and general manager. *Id.* ¶ 8. The kitchen manager is responsible for the back of the house, which includes inventory and preparation. Jaimes Decl., Ex. C.

In order for an employee to become a kitchen manager in training (KMIT) in Chipotle's Oak Brook East restaurant, the employee must be nominated by her fellow crew members. Def.'s SOMF, Ex. 16 (Zavala Dep.) at 45:1-24; Satterfield Dep. at 154:21-156:16. Once chosen, the nominated employee undergoes six to eight weeks of KMIT training. Def.'s SOMF, Ex. 15 (Thomas Dep.) at 32:11-14; Satterfield Dep. at 269:2-4. While in KMIT training, the nominated employee understands that she is not guaranteed the kitchen manager position until she is officially selected by her peers. Satterfield Dep. at 156:4-16. At some point during the training, the crew members will decide whether the nominated employee should be selected for the kitchen manager position. Zavala Dep. at 43:17-21. The selected employee is then given a confirmation

2

start date that is approved by the general manager and the team leader.  Def.'s SOMF, Ex. 11 (Benitez Dep.) at 40:22-24.

Satterfield quickly became one of the most experienced employees at the Oak Brook East restaurant.  Initially, she worked on prep and grill at Chipotle.  Within a few months, she had learned to work all stations in the restaurant.  Satterfield Dep. at 57:2-9.  In May 2014, Satterfield received a positive rating on her first evaluation and was given a raise.  *Id.* at 58:7-25.  And, at three different points in time, she was chosen by her co-workers as a KMIT candidate.

Satterfield went through KMIT training three times but was never offered the position of kitchen manager.  First, she was put up for the kitchen manager position along with another employee, Arielle Thomas, sometime in December 2013.  Thomas Dep. at 21:21-25, 23:11-13.  Satterfield went through four weeks of training, but the crew members selected Thomas to become kitchen manager.  *Id.*  Infante then asked Satterfield to stop her training.  *Id.*  Thomas testified that after she was promoted, management told Satterfield that "you're going to get promoted, just, you know, wait for your time, keep training . . . ."  *Id.* at 19:21-22.  Second, Satterfield and her co-worker Christopher Hinsley went through KMIT training sometime around early 2014.  Satterfield Dep. at 98:12-100:10.  When it came time to choose which of the two employees should receive the kitchen manager position, the crew selected Satterfield.  Thomas Dep. at 29:19-31:2.  Infante, however, chose to give Hinsley the position instead.  *Id.*  Third, sometime at the end of July or early August, Infante tasked Hinsley with training Satterfield and her co-worker Timothy Valdez to become kitchen managers.  Def.'s SOMF, Ex. 14 (Hinsley Dep.) at 50:14-22, 51:13-21.  After four weeks

3

of training, Satterfield was removed from KMIT training. Satterfield testified that Infante "told [her] that he took [her] out of the program because he didn't want to stress [her] out" during her pregnancy. Satterfield Dep. at 168:12-14, 275:17-24.

Shortly after being removed from the KMIT training, Satterfield called Chipotle's "respectful workplace" hotline. *Id.* at 122:11-19. Satterfield testified that she called the hotline in August 2014, September 2014, and October 2014. *Id.* at 149:16-150:14. Chipotle's respectful workplace consultant, Kimberly Wheeler, answered Satterfield's calls. Def's SOMF, Ex. 20 (Wheeler Dep.) at 19:4-7. Satterfield testified that in August 2014, she explained to Wheeler that she believed she was taken out of KMIT training because of her pregnancy and that she wanted to be transferred to another Chipotle restaurant because she felt uncomfortable around her co-workers. Satterfield Dep. at 149:16-150:14. Satterfield also testified that in September 2014, she called the hotline again to check on the status of her transfer because she "felt like things weren't changing." *Id.* at 151:7-8. Wheeler told Satterfield that she had informed Infante of Satterfield's complaint. Satterfield testified that once Infante became aware of her complaint, he began to treat her unfairly. *Id.* at 122:7-125:25. Satterfield also testified that her assistant manager, Fernando Benitez, complained to others that she "talk[ed] too much," referring to her hotline complaints. *Id.* at 129:4-24; Def.'s SOMF, Ex. 21 (Oct. Hotline Compl.).

Thomas testified that sometime in October 2014, she informed a crew member that she believed management was going to fire Satterfield. Thomas Dep. at 39:8-15. The crew member then relayed the information to Satterfield, which prompted Satterfield to call and write an e-mail to the respectful workplace hotline on October 3,

2014. *Id.* In the e-mail, Satterfield complained that she was the target of discrimination and that Chipotle management was retaliating against her for making complaints to the workplace hotline. Oct. Hotline Compl. On October 7, 2014, four days later, Satterfield was fired from her position at Chipotle. Def.'s SOMF, Ex. 13 (Infante Dep.) at 184:14-17.

Satterfield filed an Equal Employment Opportunity Commission (EEOC) charge in April 2015, alleging discrimination and retaliation based on sex and disability. Pl.'s Corrected Statement of Material Facts (SOMF), Ex. S. Satterfield filed this lawsuit on November 13, 2015, alleging that Chipotle violated Title VII and the PDA.

## Discussion

Summary judgment is appropriate "if the moving party shows that no genuine dispute of material fact exists and that the moving party is entitled to judgment as a matter of law." *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 861 (7th Cir. 2016). In making this determination, the Court views the record "in the light most favorable to . . . the non-moving party, resolve[s] all evidentiary conflicts in [the non-moving party's] favor, and grant[s] all reasonable inferences that the record permits" for the non-moving party. *Liu v. Cook Cty.*, 817 F.3d 307, 309 (7th Cir. 2016).

Satterfield contends that Chipotle retaliated and discriminated against her in violation of Title VII and the PDA. In count 3 of her complaint, she alleges that Chipotle terminated her employment because she complained of pregnancy discrimination to Chipotle's workplace hotline. In counts 1 and 2, Satterfield alleges that she was removed from KMIT training because of her pregnancy. She also alleges in counts 1 and 2 that she was put on a reduced hour schedule after she became pregnant. Finally,

5

Satterfield contends that Chipotle destroyed evidence relevant to this case—her performance journals—in bad faith. This is not a separate claim in her complaint; rather, Satterfield argues that she is entitled to an inference adverse to Chipotle under the spoliation doctrine. Chipotle has moved for summary judgment on all of Satterfield's claims.

**A.	Retaliation under Title VII and PDA**

To sustain a claim for retaliation, a plaintiff must prove "(1) that she engaged in statutorily protected activity; (2) that her employer took an adverse employment action against her; and (3) that the protected activity and the adverse employment action are causally connected." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016). Chipotle argues that Satterfield cannot show that she engaged in a protected activity or that her termination was causally connected to the alleged protected activity.

**1.	Protected activity**

Title VII prohibits an employer from retaliating against employees "who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016), *cert. denied*, No. 16-856, 2017 WL 77803 (U.S. Feb. 21, 2017). To constitute protected activity under Title VII, a complaint against an employer "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Chipotle argues that Satterfield did not engage in protected activity when she called the respectful workplace hotline on September 11, 2014. Def.'s Mem. in Supp. of

6

Mot. for Summ. J. at 3. It contends that Satterfield called the hotline simply to ask for a transfer and that she did not make any allegations of discrimination. *Id.* at 3-4. Chipotle supports its argument by referencing Wheeler's notes from the September 11 call. Wheeler wrote on the complaint form that, "Brittany Satterfield wants a transfer because she is uncomfortable at her current location." Def.'s SOMF, Ex. 19 (Sept. Hotline Compl.). Wheeler later testified that she did not remember the reason Satterfield felt "uncomfortable" but that she believed Satterfield did not complain of employment discrimination at that time. Wheeler Dep. at 47:13-48:11. Satterfield, on the other hand, testified that in August 2014 and September 2014, she told Wheeler that she believed she was taken out of KMIT training because of her pregnancy and that she wanted to be transferred for that reason. Satterfield Dep. at 149:16-150:14.

  Chipotle attempts to show the absence of a genuine factual dispute by crediting Wheeler's testimony and dismissing Satterfield's testimony. That is not a permissible basis for summary judgment. It is the finder of fact's role to "weigh evidence [and] determine the credibility of a witness's testimony." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (internal quotation marks omitted). To survive summary judgment, Satterfield need only present evidence sufficient to create a genuine dispute of material fact. She has done so. Satterfield testified that she told Wheeler, both in August 2014 and September 2014, that she believed she was a target of discrimination. Satterfield Dep. at 149:16-22. Satterfield also testified that she told Wheeler that her general manager, Infante, removed her from KMIT training shortly after she informed him that she was pregnant. *Id.* at 149:5-150:24. Further evidence that these hotline complaints concerned matters of discrimination comes from

7

Satterfield's October 3, 2014 e-mail. She wrote, "[I am] 14wks pregnant and being discriminated against[.] i went to the hotline and told them who i had the issue with and requested to be [transferred but] i never heard back . . . ." Oct. Compl.

Looking at the evidence in a light most favorable to Satterfield, a reasonable jury could find that she engaged in a Title VII protected activity when she called Chipotle's workplace hotline in August, 2014 and September, 2014.

### 2. Adverse employment action

In order for an employee to show that she has suffered an adverse employment action, the action "must materially alter the terms and conditions of employment." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 n. 35 (7th Cir. 2017) (internal quotation marks omitted). It is undisputed that Satterfield's termination constitutes an adverse employment action.

### 3. Causal connection

To show a causal connection between protected activity and an adverse employment action, an employee is required to demonstrate that "the desire to retaliate was the but-for cause of the challenged employment action." *Gracia*, 842 F.3d at 1019 (internal quotation marks omitted). "Retaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and other evidence from which an inference of discriminatory intent might be drawn." *Id.* (internal quotation marks omitted). Although "suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence." *Id.* at 1021.

Chipotle argues that Satterfield cannot show that management had a retaliatory motive for terminating her employment. It contends that Satterfield was fired for no other reason than her inability to perform her job satisfactorily. Chipotle notes that every employee is required to "[t]reat fellow employees and customers with respect." Def.'s SOMF, Ex. 2 at 9. Chipotle contends that Infante, Benitez, and Jaimes had issues with Satterfield's "bad attitude" that predated her complaints to the workplace hotline. Chipotle further contends that management had a plan in place to fire Satterfield weeks before she made her October 3, 2014 complaint to the hotline and that Satterfield was aware of this. Finally, Chipotle contends that Satterfield cannot show that a similarly situated employee not in her protected class was treated more favorably.

First, the evidence would permit a reasonable jury to find that Chipotle's stated reason for terminating Satterfield, her "bad attitude," is suspect and therefore pretextual. Chipotle's first and only reference to Satterfield's termination that was in writing was an e-mail dated October 7, 2014 that makes no mention—at least no direct mention—of Satterfield's bad attitude. In the e-mail, Jaimes wrote to Wheeler, "Looking at [Satterfield's] development journal she [has] about 10 conversations [written notes] so [Infante] will let her go." Pl.'s SOMF, Ex. O. Chipotle contends that the journal entries mentioned in the e-mail concern Satterfield's bad attitude, but the journal no longer exists, as Infante destroyed it. Moreover, Infante, Jaimes, and Benitez testified that managers provide constructive feedback, both good and bad, when they write in an employee's development journal. Infante Dep. at 70:21-71:8; Jaimes Dep. at 27:9:12; Benitez Dep. at 46:3-5. The only remaining evidence relating to the sort of feedback

9

Satterfield received in her journal is competing testimony from Satterfield and Chipotle; Satterfield testified that her journal did not contain any notes that criticized her for her attitude, whereas Infante and Benitez say otherwise. Satterfield Dep. at 117:3-19. The actual journal, as discussed later, no longer exists. The bottom line is that there is a genuine factual dispute over whether the attitude issue was the real reason for Chipotle's actions.

Second, the record supports a finding that, even if it considered Satterfield to have a bad attitude, Chipotle still believed that she performed her job satisfactorily prior to her October 3, 2014 complaint. For example, Infante and Jaimes conducted "operation audits" of the restaurant, which required them to identify any low performers. Jaimes Dep. at 18:23-19:18. They determined who the low performers were by speaking to crew members and managers. *Id.* at 19:6-14. Infante and Jaimes' audits dated May 30, 2014, June 27, 2014, July 27, 2014, August 28, 2014, and September 29, 2014 do not identify Satterfield as a low performer. Pl.'s SOMF, Exs. Q & R; Jaimes Dep. at 119:4-17, 121:21-123:10. Indeed, in the September 29 audit report, Infante wrote that "there are no low performers on the team." Pl.'s SOMF, Ex. Q. Similarly, Satterfield's three nominations to be a kitchen manager in training calls into question Chipotle's claim that she was not performing her job satisfactorily. Satterfield's crew members nominated her to undergo kitchen manager training at three different points in time, the last in July 2014. A Chipotle employee who is a low performer cannot a kitchen manager in training. Thomas Dep. at 62:17-19. Finally, Infante's actions toward Satterfield further calls into doubt the contention that she was not performing her job satisfactorily. Chipotle's policy is to swiftly remove low performers. Jaimes Dep. at

10

106:1-25. Although Chipotle contends that Infante had problems with Satterfield's "bad attitude" for several months, he did not take steps to terminate or even tell her she was at risk to be terminated until after she e-mailed the workplace hotline on October 3, 2014. And although Infante contends he kept Satterfield on staff because the restaurant was understaffed, other evidence indicates that he had previously fired a number of employees without considering the effect on the size of the crew. Satterfield Dep. at 61:8-62:12. Indeed, only eight employees were running the restaurant for a certain period of time. *Id.* at 63:25-64:9.

Third, the record would permit a reasonable jury to find that Chipotle did not, in fact, intend to fire Satterfield before she made her October 3, 2014 complaint to the workplace hotline. Benitez testified that prior to October 3, 2014, he, Infante, Hinsley, and Valdez decided to terminate Satterfield. Benitez Dep. at 89:14-22. Hinsley, however, testified that he was not aware of a plan to terminate Satterfield prior to October 3, 2014, at least not a plan that was communicated to him. Hinsley Dep. at 58:12-59:6. Likewise, Valdez testified that he was not aware of a plan to terminate Satterfield prior to October 3, 2014. Def.'s SOMF, Ex. 12 (Valdez Dep.) at 41:21-42:12. Moreover, Valdez testified that he was not involved in the decision to terminate Satterfield at all. *Id.* at 41:21-25.

Finally, the record would permit a reasonable jury to find that Satterfield was treated less favorably than similarly situated employees who had "bad attitudes" but who did not complain of discrimination. When determining whether a plaintiff has identified a similarly situated employee, the "basic question is whether the situations are similar enough, apart from the employees' [protected status] to provide support for a

11

reasonable inference of discrimination." *Lane v. Riverview Hosp.*, 835 F.3d 691, 696 (7th Cir. 2016). Arguments regarding the "closeness of the 'fit' between comparisons will often present questions for trial rather than for summary judgment." *Id.* (internal quotation marks omitted).

Jacquelyn Zavala worked at Chipotle with Satterfield. Zavala Dep. at 10:2-12:19. When asked who else in the restaurant besides Satterfield had a bad attitude, Zavala identified herself. *Id.* at 52:16-19. She testified that she had a poor attitude when she initially began working at Chipotle but that she improved after eight months due to several performance-related discussions that she had with management. *Id.* at 52:19-53:1. Zavala was not fired in the intervening eight months for her bad attitude although, as she testified, she was written up for her attitude several times. *Id.* at 53:4-54:17. Valerie Edwards was also known for having a bad attitude and was cited for this several times. Infante Dep. at 203:21-24; Benitez Dep. at 52:16-53:4, 105:16-23. There is evidence, however, that Edwards was not fired. Benitez Dep. at 105:7-11. Benitez explained, "[Edwards] quit. ·That's all it was to it. It wasn't -- no, nothing. Nothing big." *Id.* at 110:7-9.

In its reply, Chipotle argues that Zavala and Edwards are not valid comparators. It contends that Zavala improved her attitude after eight months, whereas Satterfield allegedly had a bad attitude until the day she was fired. Def.'s Reply at 8. This argument concerns the closeness of the fit between Satterfield and Zavala, and a reasonable jury could find the two are comparable, so it is an issue for trial. *See Lane*, 835 F.3d at 696.

Chipotle also argues that Edwards *was* fired for her bad attitude and was therefore treated the same as Satterfield. Def.'s Reply at 8. This argument is equally unsuccessful on summary judgment because there is a genuine dispute regarding the circumstances of Edwards's departure from Chipotle. Infante testified that Edwards was fired. Infante Dep. at 203:1-6. But as just indicated, Benitez testified that Edwards quit. Benitez Dep. at 110:7-9. And Hinsley testified that Edwards asked management to fire her because she wanted to be able to collect unemployment benefits that would not be available to her if she quit. Hinsley Dep. at 59:19-60:11. And although Chipotle contends that Infante is the final decision maker and the only person who is able testify on the matter, Infante testified that, "We talked to all the team members, the management as well, and then we came to a final decision." Infante Dep. at 203:8-10. The Court concludes that there is competent and admissible evidence that would permits a reasonable jury to find that Edwards was not fired and that she is therefore a valid comparator who was treated more favorably than Satterfield.

Based on the evidence presented, a reasonable jury could conclude that Chipotle's decision to fire Satterfield was motivated by a desire to retaliate against her for engaging in protected activity. Chipotle is not entitled to summary judgment on count 3.

**B. Discrimination claim under Title VII**

Title VII makes it unlawful for an employer to "discharge or otherwise discriminate against an employee in the terms and conditions of employment because of such individual's sex." *Hall v. Nalco Co.*, 534 F.3d 644, 646-47 (7th Cir. 2008) (internal quotation marks omitted). The PDA "clarified the scope of Title VII by recognizing

13

certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Id.* The relevant example here is that the PDA made clear that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* (internal quotation marks omitted).

To succeed on a Title VII discrimination claim, a plaintiff must present evidence, direct or circumstantial, that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *David*, 846 F.3d at 224 (internal quotation marks omitted). Chipotle argues that it is entitled to summary judgment on Satterfield's claim because she is unable to prove that her removal from KMIT training or her reduction in hours had to do with her pregnancy.

### 1. Kitchen manager training

Chipotle argues that Satterfield cannot establish a causal relationship between informing Infante she was pregnant and her removal from KMIT training shortly thereafter. As indicated earlier, Chipotle contends that Infante removed Satterfield from KMIT training because of her bad attitude. Chipotle also contends (presumably in the alternative) that Satterfield was not removed from KMIT training but rather opted out of the training. It argues that because a kitchen manager is required to work on the grill, Satterfield effectively took herself out of KMIT training when she asked to work on the grill less because she believed inhaling smoke from the grill could be detrimental to her pregnancy.

As indicated in the previous section, Satterfield has offered evidence that would permit a reasonable jury to find that the "bad attitude" claim is pretextual. And even

14

without that, Satterfield has offered other evidence sufficient to permit a reasonable jury to find that she was removed from KMIT training because of her pregnancy. Satterfield testified that one to two weeks after she informed Infante that she was pregnant, Infante "told [her] that he took [her] out of the program because he didn't want to stress [her] out" during her pregnancy. Satterfield Dep. at 168:12-14, 275:17-24. This is direct evidence of discrimination that, if believed by a jury, would support a finding in Satterfield's favor.

### 2. Reduced hours

Chipotle also argues that Satterfield cannot establish a causal connection between Infante learning of her pregnancy and his reduction of her work schedule. The record reflects that the hours of every employee in the Oak Brook East restaurant, including Satterfield, were reduced during the relevant period when the restaurant hired more employees. When there were only eight workers staffing the restaurant, Satterfield worked from eight to twelve hours a day. Satterfield Dep. at 63:25-64:9. Toward the latter part of Satterfield's employment at Chipotle, however, the restaurant had nearly double the employees. Def.'s SOMF, Ex. 17 (Saavedra Dep.) at 10:1-15, 12:2-19. With the new hires, all non-management employees had their hours reduced. Hinsley Dep. at 46:20-23. Although Satterfield worked 56.94 hours in her final pay period of September 22, 2014 to October 5, 2014 despite averaging 79.62 hours a week in previous pay periods, Satterfield's hours were within in the range of hours assigned to her peers. Def.'s SOMF, Ex. 18. For example, for the week of September 22-29, 2014, Satterfield was scheduled to work for 36.25 hours, whereas the range of hours scheduled for crew members other than the general manager was 29.25 to 38.00 hours.

Pl.'s SOMF, Ex. L. The same is true for every week other than Satterfield's final week, for which she was not scheduled for any hours. In short, although Satterfield's hours were reduced, the same was true of other workers, and there is no evidence that would permit a reasonable jury to find that her reduction was disproportionate. Absent comparative evidence that reasonably would permit a finding of differential treatment—which is lacking—no reasonable jury could find that Chipotle reduced Satterfield's hours because of her pregnancy.

**C. Spoliation**

"When a party intentionally destroys evidence in bad faith, the judge may instruct the jury to infer the evidence contained incriminatory content." *Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). "The crucial element in a spoliation claim is not the fact that the documents were destroyed but that they were destroyed for the purpose of hiding adverse information." *Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428 (7th Cir. 2010). Thus, "in order to draw an inference that the absent documents contained negative information, [the party seeking the adverse inference] must show that the documents were intentionally destroyed in bad faith." *Everett v. Cook Cty.*, 655 F.3d 723, 727 (7th Cir. 2011).

At Chipotle, every crew member has a performance or development journal. Infante Dep. at 60:16-21. Managers use an employee's journal to document her progress and provide feedback. *Id.* at 61: 6-24. For example, a manager might set a goal for the employee and write down the ways in which that employee could meet her goal. *Id.* Once an employee leaves Chipotle, the general manager is tasked with

shipping the former employee's journal(s) to a storage facility in Denver, Colorado. *Id.* at 63:1-3.

Infante was tasked with handling Satterfield's performance journal. He testified that he did not know at the time that he had to ship the journal to Denver after she left Chipotle. *Id.* He stated that his own protocol was to keep journals in his office until someone requested them. *Id.* at 63:1-8. Infante further stated that if a year goes by without someone asking for a journal, he throws it out. *Id.* at 63:10-10. He testified that around October 2015, he threw Satterfield's journal "in the trash so [he] could make room in [his] office." *Id.* at 64:2-3.

Satterfield contends that Chipotle, in bad faith, allowed her journal to be destroyed. She argues that Chipotle was aware of her potential lawsuit as early as April 2015, when she filed her EEOC charge. Satterfield argues that Chipotle's failure to instruct Infante to keep the journals or "to make an adequate request for relevant documents before they were destroyed" is evidence of bad faith. Pl.'s Resp. at 8.

Satterfield has not offered evidence that would permit a reasonable finding that Chipotle intentionally destroyed her performance journal for the purpose of concealing adverse information. There is no evidence that Chipotle instructed Infante to destroy the journal. And there is no evidence to suggest that Infante was aware of Satterfield's EEOC charge at the time or that he treated her journal differently from those of other workers under his supervision who had not filed EEOC charges.

Satterfield may be able to introduce at trial evidence that Infante discarded her journal—the Court can decide that issue alter—but the Court is unpersuaded that she is entitled to a jury instruction entitling her to an adverse inference.

17

**Conclusion**

For the reasons stated above, the Court denies defendant's motion for summary judgment [dkt. no. 34] on all counts but strikes from counts 1 and 2 of plaintiff's complaint her contention that her hours were reduced for discriminatory reasons. The case is set for a status hearing on April 11, 2017 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 6, 2017